## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| BENJAMIN CRAVER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:24-cv-02119-SCJ |
| | ) | |
| v. | ) | |
| | ) | |
| EMORY UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### BRIEF IN SUPPORT OF
### AMENDED MOTION FOR PRELIMINARY INJUNCTION[1]

Plaintiff Benjamin Craver ("Ben") respectfully moves for a preliminary injunction against Defendant Emory University to halt his imminent and baseless semester-long suspension imposed after Emory Honor Council proceedings that were rife with errors and misapplication of its own rules. As detailed below, Ben has a substantial likelihood of success on the merits for his breach-of-contract claim against Emory, and not enjoining Emory's suspension pending the outcome of this case would cause him irreparable harm, including missed educational and social

---

[1] Plaintiff Benjamin Craver submits this Brief in Support of his Amended Motion for Preliminary Injunction pursuant to this Court's May 17, 2024 Order (Dkt. 13) and Rule 10(a), identifying himself by name instead of pseudonymously as "John Doe." In addition, this Brief reflects allegations based on Exhibit B to the First Amended Complaint, the Declaration of Vanessa Youshaei, which was made available only after the original complaint was filed. Finally, the title of this Brief is reformatted to comply with this Court's standing order.

opportunities, as well as permanent damage to his reputation and professional prospects. Meanwhile, a temporary injunction poses no conceivable harm to Emory or the public.

## I.    BACKGROUND

Emory has arbitrarily and capriciously suspended Ben for what it encouraged and paid him to do. Ben and Emory Student 1 are undergraduate students at Emory. Ex. A, Craver Declaration ("Craver Decl.") ¶¶ 3, 7.[2] Over the winter break between the fall 2022 and spring 2023 semesters, Emory Student 1 created Eightball, an online platform that uses artificial intelligence to generate learning tools like flash cards and study guides. Craver Decl. ¶ 7. During the spring 2023 semester, Emory awarded Ben and Emory Student 1 the $10,000 grand prize in its annual Pitch the Summit competition to support their development of Eightball. Craver Decl. ¶¶ 18-23, Ex. 5 at 1; Ex. B, Declaration of Vanessa Youshaei ("Youshaei Decl.") ¶ 5. Over the next several months, Emory Student 1 developed Eightball's code and capabilities in the manner described and forecasted in the award-winning presentation; Ben's role was limited to marketing the product by making a few social media posts and emailing Emory students and professors about the product. Craver Decl. ¶¶ 11, 12, 22, 27, 29. All the while, Emory faculty demonstrated

---

[2] Exhibits A and B and the numbered exhibits to Exhibit A refer to the attachments to the First Amended Complaint filed contemporaneously.

Eightball in classes, administrators connected Ben and Emory Student 1 with distinguished alumni to offer advice, and students began using the software as a learning supplement. *Id.* ¶¶ 15-17, 24, 26, 30, Ex. 6 at 16. No one in the Emory community objected or raised any concern that Eightball could be used to cheat. *Id.* ¶ 28; Youshaei Decl. ¶ 6.

Emory's view toward Eightball apparently changed in November 2023 after Emory Student 1, as forecasted at the Pitch the Summit competition, linked Eightball to Emory's Canvas platform. Craver Decl. ¶ 29. The connection expedited the process by which students could upload materials to Eightball, but it did not otherwise change the product's function or capabilities. *Id.* On November 13, 2023, Emory's Office of Student Conduct notified Ben that Eightball's link to Canvas may have violated Emory's student conduct and IT policies. *Id.* ¶ 40, Ex. 12. Seeking to ameliorate the situation, Ben, who lacked the credentials and technological know-how to shut down Eightball himself, immediately asked Emory Student 1 to do so, which he did. *Id.* ¶¶ 42-43. Ben also agreed to write an apology letter as an Eightball team member and a research paper covering the importance of understanding policy considerations in tech start-ups. *Id.* ¶ 44. Emory's Office of Student Conduct considered the matter closed. *Id.*

Nevertheless, Emory's Honor Council continued to investigate and prosecute Ben for violating the school's Honor Code. Craver Decl. ¶¶ 45-47. The Honor

Code is Emory's written community standards for academic integrity and rules for applying them. Emory requires its students to accept the Honor Code as a condition of their attendance. Craver Decl. ¶ 36, Ex. 10 at Honor Code § II. The Honor Code's procedure requires that before imposing discipline for a student's alleged breach of the Honor Code, Emory must conduct a hearing, support any finding of responsibility with clear and convincing evidence, and offer an opportunity to appeal. Craver Decl. ¶ 36, Ex. 10 at Procedures of the Honor Code §§ V-VII. Leading up to the hearing, Senior Associate Director of the Honor Council Blaire Wilson and Investigating Honor Council Faculty Member Dr. Levi Morran informed Ben that Emory's previous support of Eightball would be an important factor in his hearing. Craver Decl. ¶ 46.

Emory held a hearing on January 18, 2024 to address the allegation that Ben's promotion of Eightball facilitated cheating. Craver Decl. ¶ 47, Ex. 13 at 1. To be clear, Emory never suggested that Ben or anyone else ever actually used Eightball to cheat, and Ben in fact has never cheated or helped anyone to cheat. At the hearing, the Honor Council comprised of a Spanish professor and four undergraduate students heard from Ben, Emory Student 1, and two Emory IT workers about Eightball and its link to Canvas. Craver Decl. ¶ 47, Ex. 13 at 2-3. During the hearing, one of the IT workers suggested—without foundation or evidence and only when prompted—that Eightball had the "potential" to be used for cheating. *Id.* at 3.

Following the hearing, the Honor Council determined that Ben was responsible for violating the Honor Code, for two primary reasons. First, it determined that Eightball *could* be used to cheat, and thus it inferred that Ben *intended* to facilitate cheating on campus. Craver Decl. ¶ 47, Ex. 13 at 6-7. Second, it noted that Eightball's slide deck from the Pitch the Summit competition suggested that Eightball might adopt a pricing model similar to Chegg and a "Check your Answer" feature—but the Honor Council did not solicit or hear testimony regarding the reference to Chegg, and the Check your Answer tool was never created. Craver Decl. ¶ 47, Ex. 13 at 6-7; ¶¶ 48-50. Emory concluded that Ben intended to help others cheat and suspended him for the Fall 2024 semester. Craver Decl. ¶ 47, Ex. 13 at 6-7; ¶¶ 51-53. Ben appealed, but Emory sustained the suspension without considering Ben's primary argument that the suspension was unduly harsh given that Emory had paid him to develop Eightball in the first place. Craver Decl. ¶ 56, Ex. 17 at 2; ¶¶ 56-59. Meanwhile, the Emory community continued to endorse Eightball when, on February 6, 2024, an Emory Entrepreneurship & Venture Management team member invited Ben and Emory Student 1 to dinner to offer additional funds as the first grant from its Excellerator program. Craver Decl. ¶ 55, Ex. 16 at 2. And still today, Emory continues to publicly applaud Eightball as an example of student innovation and entrepreneurship. Craver Decl. ¶ 5, Ex. 1 at 2.

The suspension, if carried out, will have substantial and irreparable

consequences for Ben. Most obviously, Ben would miss out on the education, social development, and personal growth that occurs over a semester of college with his close friends and classmates. Craver Decl. ¶ 63. A suspension also will disrupt Ben's college career and jeopardize the years he spent building relationships and establishing a presence on campus. *Id.* ¶¶ 3, 64-65. The suspension from campus will fracture the continuity in Ben's education and bar him from participating in the honor's thesis program to which he was accepted, denying him the already-earned opportunity to develop essential research and writing skills and an important credential on his resume. *Id.* ¶¶ 62-63. Moreover, the suspension would permanently weaken Ben's career prospects because he would miss out on on-campus recruiting opportunities and the benefits of career services, and he would need to explain the suspension to future potential employers, graduate schools, and state bars. *Id.* ¶ 66. The suspension will permanently remain in Emory's disciplinary records, forever calling his integrity into question. *Id.* ¶¶ 53, 67.

## II.    ARGUMENT

"The decision to grant preliminary injunctive relief is within the broad discretion of the district court." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1339 (N.D. Ga. 2018). Preliminary injunctive relief is warranted when a plaintiff can establish the following four elements: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be

suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Cellairis Franchise, Inc. v. Duarte*, No. 2:15-CV-00101-WCO, 2015 WL 6517487, at *5 (N.D. Ga. Oct. 21, 2015). These criteria all support a preliminary injunction, vacating the suspension until this case is resolved.

### A.   Plaintiff Has A Substantial Likelihood Of Success On The Merits.

Ben is likely to succeed on his breach of contract claim. "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Anthony v. Concrete Supply Co., Inc.*, 241 F. Supp. 3d 1342, 1348 (N.D. Ga. 2017). Ben has pleaded, and the undisputable facts show, each element.

For starters, Ben and Emory were under a contract that included the Honor Code. Under Georgia law, private universities and students enrolled therein are in contract. *See Williams v. Corp. of Mercer Univ.*, 542 F. Supp. 3d 1366, 1375 (M.D. Ga. 2021). The contract consists of the student handbook, bulletins, catalogs, university policies, and course webpages. *See id*. Accordingly, "Georgia law permits an expelled student to bring a breach of contract action against a private educational institution." *Morehouse Coll., Inc. v. McGaha*, 277 Ga. App. 529, 531 (2005). In fact, this Court has ruled specifically that an Emory student and Emory

University are in contract when the student pays tuition and fees, participates in educational programs and activities, complies with the codes of conduct, and completes coursework. *See Doe v. Emory Univ., Inc.*, No. 1:21-CV-4859-TWT, 2022 WL 17419555, at *8 (N.D. Ga. Dec. 5, 2022) (concluding plaintiff-student stated breach-of-contract claim against Emory based on Emory's alleged failure to follow its own policies regarding discipline). Ben has been enrolled full-time at Emory for the last three years, and during that time, he completed coursework at a high level, participated in the school's academic and social community, and complied with the university's code of conduct. Craver Decl. ¶¶ 3-4. Furthermore, the Honor Code is available online, mandatory by its own terms, and Emory required Ben to accept the Honor Code as part of his coursework. *Id.* ¶ 36, Ex. 10 at Honor Code § II. Thus, Ben is in contract with Emory, and the Honor Code is part of that contract.

Emory breached the express terms of its contract with Ben when it failed to follow the Honor Code's procedures before suspending him. In the case of *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014), the court preliminarily enjoined the suspension of a student because it saw "very little evidence" supporting the university's findings of misconduct. *Id.* at *12. Here, the Honor Code states that Emory will not impose discipline absent "clear and convincing evidence" of misconduct. Craver Decl. ¶ 36, Ex. 10 at Procedures of the

Honor Code § V(G).   But the Honor Council found Ben responsible for "intentionally helping or attempting to help another person" to cheat based solely on one IT employee's prompted, speculative, and passing comment that Eightball theoretically could be used to cheat, and that Eightball's deck from the Pitch the Summit competition proposed a pricing model similar to Chegg and a "Check your Answer" homework helper tool.   Craver Decl. ¶ 47, Ex. 13 at 6-7; ¶¶ 48-50.   One baited comment from an IT worker plus one award-winning presentation's forecasted pricing model and never-implemented feature does not equal clear and convincing evidence that Ben ever intended to facilitate cheating.   Rather, these facts constitute at most "very little evidence," and certainly not clear and convincing evidence that Ben, or anyone for that matter, actually cheated or intended to facilitate cheating.   *See DePauw*, 2014 WL 4197507, at *12.

The Honor Council's decision reflects several other fatal procedural pitfalls as well.   For example, Emory's standard—anything that could be used to cheat demonstrates an intent to cheat—is novel and non-ascertainable; indeed, laptops, calculators, and textbooks *could* be used to cheat, but Emory would doubtfully punish their creators.   The Honor Council also disregarded Ben's argument and evidence showing that Emory's faculty, students, alumni, and pocketbook had previously supported Eightball, Craver Decl. ¶¶ 57-58, and thus Ben's promotion of the product could not have violated the community's academic standards.

Moreover, the Honor Council never asked Ben about the reference to Chegg, *id.* ¶ 49, and therefore denied him a basic opportunity to be heard regarding the "evidence" on which he would ultimately be found responsible. It also found him responsible for simply proposing a "Check your Answer" tool that was never actually created. *Id.* Finally, Emory imposed an unduly harsh one-semester suspension, a punishment reserved for extreme offenses like sexual assault. *See, e.g.*, *Doe v. Emory Univ.*, No. 1:21-CV-2763-MHC, 2022 WL 5241289, at *2 (N.D. Ga. Sept. 1, 2022).

Emory likewise failed to provide a meaningful appeals process, as the Honor Code contractually guarantees. "The conclusory and dismissive denial [of an appeal] may contribute to an ultimate finding that [the university's] process was arbitrary or capricious." *Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 WL 1836939 (N.D. Ind. May 8, 2017). Emory, in this instance, summarily denied Ben's appeal without a hearing, a written and reasoned decision, or any evidence whatsoever that Emory even considered the arguments in his 12-page letter. Craver Decl. ¶ 57, Ex. 18. In fact, Emory informed Ben that the panel expressly declined to consider the argument that Emory had encouraged and even paid him to help develop Eightball in the first place. Craver Decl. ¶ 58. Their failure to do so also contradicts the Honor Council's own representations to Ben that Emory's extensive prior financial support and encouragement of Eightball obviously

would be an important factor in his hearing. *Id.* ¶ 46.  The appeal panel's decision to uphold Ben's suspension at one semester while simultaneously reducing the sanction for Emory Student 1, the founder, creator, and by far the most involved member of Eightball, from one year to one semester further demonstrates the arbitrariness of the process. *Id.* ¶ 60.

Relatedly, Emory is equitably estopped from disciplining Ben for promoting Eightball because it encouraged him to do so in the first place. "Equitable estoppel bars a party from taking inconsistent positions in order to reap the benefits of a position and, at the same time, avoid the corresponding obligations of that position." *Terry v. Norfolk S. Ry. Co.*, 948 F. Supp. 1058, 1061 (N.D. Ga. 1996).  A party to a contract is equitably estopped when, through an intentional or grossly negligent misrepresentation, it induces the other party to act against its own interest.  In this instance, Emory repeatedly encouraged Ben to develop Eightball: it awarded Ben and Emory Student 1 the $10,000 grand prize at the Pitch the Summit competition, introduced them to distinguished alumni, demonstrated Eightball during lectures, sought to provide more funding to Eightball through Emory's Excellerator program, published multiple articles lauding their achievements, and proudly featured Eightball on Emory websites.  Craver Decl. ¶¶ 5-6, 14-26, 55; Youshaei Decl. ¶ 6. And when Ben expressly informed members of the Emory community that students were using Eightball, the Honor Council remained silent.  *Id.* ¶¶ 27-28.  In doing so,

Emory represented to Ben that it supported his work on Eightball, and Ben reasonably relied on that representation in continuing to promote Eightball. Emory's administration and faculty had many opportunities to object, but the university is now equitably estopped from punishing Ben for promoting Eightball, as it encouraged him to do.

Finally, Ben also has suffered, and will continue to suffer, injuries from Emory's breach of contract. Ben's harm is discussed in greater detail below, but includes lost educational, social, and experiential opportunities, reputational damage, and reduced career prospects.

Ben thus has a substantial likelihood of succeeding on the merits of his breach of contract claim against Emory.

## B.  Plaintiff Will Suffer Irreparable Harm If His Suspension Remains In Place.

Beyond being likely to succeed on the merits, Ben will suffer irreparable harm if Emory carries out the suspension. "An injury is irreparable if it cannot be undone through monetary remedies" or if the damages "would be difficult or impossible to calculate." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). Of course, "to be thwarted from any productive employment in [one's] field is an enormous loss" and constitutes irreparable harm. *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1311 (11th Cir. 2023) (granting preliminary injunction to reduce scope of non-compete agreement). Accordingly, courts frequently find that a suspension

irreparably harms the student's occupational and educational prospects.  *See, e.g.,*
*Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt.
Sept. 16, 2015) (granting preliminary injunction because plaintiff otherwise would
miss out on opportunity to graduate with his class and "have to explain, for the
remainder of his professional life, why his education either ceased prior to
completion or contains a gap"); *DePauw*, 2014 WL 4197507, at *13 (same because
it is "inevitable that [plaintiff] would be asked to explain [the] situation by future
employers or graduate school admissions committees, which would require him to
reveal that he was found guilty" of misconduct and "any explanation is unlikely to
fully erase the stigma associated with such a finding"); *Doe v. Univ. of Connecticut*,
No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) (same
because plaintiff "would need to explain a gap on his résumé in future applications
to schools or jobs" which would "forever change the trajectory of his education and
career"); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *12 (granting
preliminary injunction barring student's dismissal because "[t]he questions the gap
raises, and the explanation it requires, are potentially damaging to [student] in a
manner not compensable by money damages"); *Ritter v. State of Oklahoma*, No.
CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) (citing
*Kroupa v. Nielsen*, 731 F.3d 813, 821 (8th Cir. 2013)) (same because "[t]he loss of

educational and career opportunities [plaintiff] will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages").

Like the plaintiffs in *DePauw*, *Univ. of Connecticut*, *Middlebury*, *Notre Dame*, and *Ritter*, Ben will suffer definitive, irreparable harm if Emory suspends him. Most obviously, "money damages cannot compensate for the loss of his senior year in college with his class." *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *3. Beyond missing a semester of instruction and irreplaceable time with his close friends and classmates, Ben particularly will not be able to participate in the honor's thesis program to which he was already accepted, thus restricting him from an invaluable educational opportunity to develop his research and writing skills and earn an important credential. Craver Decl. ¶ 62. He also will not be able to serve as treasurer of the judo club, unfairly denying him this earned leadership position and social outlet. *Id.* ¶¶ 3, 63, 65. Ben will immediately feel the detriment on his career prospects because he will be applying and interviewing for jobs and law school during the fall 2024 semester, and he will be forced to explain the gap in his academic record. *Id.* ¶ 64, 66. The suspension thus will shut professional doors that he worked hard to open. Indeed, all these harms would be permanent and irreversible, even though Ben has in no way cheated or purposefully helped others cheat.

The irreparable harm that Ben would suffer without an injunction demonstrates why immediate court intervention is necessary.

**C.    The Threatened Injury To Plaintiff Significantly Outweighs Any Conceivable Injury To Defendant Or The Public Interest.**

Finally, issuing a preliminary injunction would not adversely affect Emory or the public writ large.  Emory was never harmed by Eightball: Emory awarded Emory Student 1 and Ben funds to develop and promote the product, and to this day, Emory advertises their innovation in developing this unique learning tool.  Craver Decl. ¶ 5, Ex. 1. Even so, Emory Student 1, at Ben's behest, already shut down Eightball at Emory.  Craver Decl. ¶ 43.  Consequentially, Emory does not face any risk to its academic integrity, just as it has not from the start.  Similarly, the public interest would not be served by suspending a student who marketed a product that his university had, up to that point, embraced.  If anything, the public would benefit from encouraging more entrepreneurship of the sort that Ben and Emory Student 1 demonstrated.

**III.    CONCLUSION**

For these reasons, Plaintiff respectfully requests that this Court enter a preliminary injunction barring Emory's disciplinary measures, including its suspension of Plaintiff for the Fall 2024 semester.


Dated: May 20, 2024                          Respectfully submitted,

*/s/ Craig. C. Martin*        
Craig C. Martin
John D. Mitchell (admitted *pro hac vice*)
Jeremy H. Salinger (admitted *pro hac vice*)
Olivia R. Varnado (admitted *pro hac vice*)
Nathan Pflaum (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Street, Suite 5000
Chicago, IL 60654
(312) 728-9000
cmartin@willkie.com
jmitchell@willkie.com
jsalinger@willkie.com
ovarnado@willkie.com
npflaum@willkie.com

Christopher E. Adams
GA Bar No. 789600
Halsey G. Knapp, Jr.
GA Bar No. 425320
Jennifer K. Coalson
GA Bar No. 266989
KREVOLIN & HORST, LLC
1201 W. Peachtree St. NW
Suite 3250
Atlanta, Georgia 30309
adams@khlawfirm.com
hknapp@khlawfirm.com
coalson@khlawfirm.com

Ronald S. Sullivan Jr.
GA Bar No. 691575
Ronald Sullivan Law PLLC
300 I Street NW
Suite 400E
Washington, DC 20005
(202) 313-8313
rsullivan@ronaldsullivanlaw.com

*Attorneys for Plaintiff*